IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:03CV949 |
| | ) | |
| AMERICAN EUROCOPTER LLC, AMERICAN EUROCOPTER CORPORATION and EUROCOPTER, S.A.S., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

This matter is before the Court on Motions for Summary Judgment [Document #19, 21]

by Defendants American Eurocopter LLC, American Eurocopter Corporation and Eurocopter,

S.A.S. ("Defendants"), as well as various other procedural motions, motions to strike, and motions

in limine. For the reasons discussed below, Defendants' Motions for Summary Judgment

[Document #19, 21] are denied. The Court will address the procedural motions as part of this

Memorandum Opinion, and will address the remaining motions in limine at trial.

I.    FACTUAL BACKGROUND

Plaintiff Indemnity Insurance Company of North America ("Plaintiff") brings multiple

claims related to the crash of a Life Flight Air Medical Transport helicopter ("the helicopter")

owned by Duke University Medical Center ("Duke") and insured by Plaintiff. The helicopter was

manufactured by Eurocopter, S.A.S., ("E.S.A.S.") a French Corporation, and was purchased by

Duke in 1992 for $1,460,143. Duke contracted with Corporate Jets, Inc. ("CJ") to maintain and

operate the helicopter for Duke. Pursuant to the Service Agreement between Duke and CJ, CJ was

responsible for servicing, maintaining, operating, repairing, and piloting the helicopter for Duke.

In September 2000, the main gearbox and related components of the helicopter required an overhaul. CJ obtained an overhauled main gearbox (which is apparently similar to a rebuilt transmission) and related components from Defendant American Eurocopter Corporation for $249,992.51. American Eurocopter Corporation is a separate corporate entity organized under the laws of Delaware with its principal place of business in Texas, and is the predecessor to American Eurocopter LLC. Defendants American Eurocopter Corporation and American Eurocopter LLC are referred to collectively as "American Eurocopter." American Eurocopter is a distributor for E.S.A.S., and also provides repair services and sells overhauled parts that have been overhauled by American Eurocopter for use in helicopters manufactured by E.S.A.S.

According to Plaintiff, American Eurocopter negligently performed the overhaul of the main gearbox in that the overhauled main gearbox sold to CJ included an oil pump with a pump driver gear that did not meet production specifications. Plaintiff contends that the overhauled oil pump, which was contained in the overhauled main gearbox, was defective or contained improper parts, and was not airworthy. Plaintiff further contends that American Eurocopter knew that the overhauled oil pump was defective because tests performed by American Eurocopter during the overhaul of the oil pump indicated that the oil temperatures from the pump exceeded its allowed limits. Plaintiff contends that American Eurocopter did not address the defect and falsely certified that the overhauled gearbox was "airworthy."

CJ received the overhauled main gearbox and related components from American Eurocopter and installed the main gearbox and components into the helicopter on October 12, 2000. The aircraft was then placed back into service. Four days later, on October 16, 2000, the helicopter departed Duke on an air medical transport mission. During the flight, the main

transmission oil pressure warning light (the "warning light") illuminated. The pilot landed the helicopter at Alamance Regional Medical Center ("Alamance Hospital"). The flight nurses and patient left for Duke in a ground ambulance. The pilot, who was employed by CJ, called and described the problem to the helicopter mechanic, who was also employed by CJ. It was surmised between them that the problem likely related to a faulty warning light switch, rather than any actual problem with the helicopter or the gearbox. The CJ mechanic drove from Durham to Alamance Hospital to check the helicopter. The mechanic performed a visual inspection for oil leaks and found none. There were no helicopter maintenance facilities at Alamance Hospital, and the mechanic did not bring tools or a replacement switch with him. Therefore, the pilot and the mechanic made the decision to disconnect the oil pressure switch from the warning light, thus disabling the warning system, run the Helicopter on the ground, hover it, and if there were no further indications of any problems, fly it back to Duke (approximately 35 miles away) without ever reconnecting the warning light. However, during the return flight, the helicopter crashed into a residential neighborhood approximately 1.3 miles from Alamance Hospital. The pilot died and the helicopter was destroyed. The crash caused property damage to nearby homes and some personal injury medical expenses, together totaling $52,508.00.[1]

Plaintiff contends that the crash was caused by the negligently overhauled oil pump, which failed to maintain adequate oil pressure. The decreasing oil pressure was inadequate to lubricate the power transfer gears, causing temperatures to rise and the gears to melt. This led to failure of the

---

[1] This figure represents the amount of damages alleged in the pleadings. The exact amount to be claimed is subject to the proof to be offered by Plaintiff at trial. In addition, the present action does not involve claims related to the death of the pilot, because those claims are the subject of a separate lawsuit brought by the pilot's estate in Texas state court.

gears and ultimately a total loss of power in the main rotor, causing the helicopter to crash. However, Defendants contend that the oil pump was not negligently overhauled, and that even if there were a problem with the oil pump, the warning light operated properly, and the mechanic and pilot were negligent in deciding to disconnect the warning light and fly the helicopter back to Duke for repairs.

## II.  CLAIMS AND DEFENSES

Plaintiff brings claims against E.S.A.S. for (1) Product Defect based on the alleged defective design of the helicopter itself; (2) Failure to Warn regarding potential defects in the helicopter and its component parts; (3) Misrepresentation of the helicopter as "airworthy;" and (4) Negligent Design and Manufacture of the Helicopter and its component parts.  As to Defendant American Eurocopter, Plaintiff brings the following claims: (1) Product Liability for defects in the helicopter components, presumably based on the allegedly defective gearbox; (2) Failure to Warn of hazards related to the main gearbox; (3) Misrepresentation that the main gearbox was safe for flying, when in fact American Eurocopter knew or should have known that the main gearbox was not airworthy and that the airworthiness was "affirmatively misrepresented;" (4)  Negligent Maintenance and Repair of the main gearbox based on American Eurocopter's negligence in overhauling the gearbox and failure to properly test the gearbox before certifying it as airworthy; (5) Negligence Per Se based on American Eurocopter's failure to follow required FAA regulations in performing the overhaul of the gearbox that was eventually sold to CJ; (6) Breach of Contract by American Eurocopter for failing to provide overhauled or component parts that were "airworthy" as required by the contracts between CJ and American Eurocopter; and (7) Breach of Express and Implied Warranties based

on American Eurocopter's express certification that the gearbox was "airworthy," "in compliance with FAA regulations," and "free from defects in material and workmanship."

Defendants have moved for Summary Judgment based on the following contentions. First, Defendants contend that as to all of Plaintiff's claims, the claims must fail because any alleged misconduct or failure by the Defendants was not the proximate cause of the crash. Second, Defendants contend that all of Plaintiff's claims would be covered by North Carolina's product liability statutes, and therefore would be barred pursuant to North Carolina General Statute § 99B-3 and § 99B-4 due to the pilot and mechanic's alteration of the warning light and failure to properly heed the warning light. Third, Defendants contend that Plaintiff's tort claims are barred by the "economic loss doctrine" because Plaintiff seeks recovery for damage to the "product itself." Finally, Defendant American Eurocopter contends that Plaintiff's contract claims fail because the applicable contract for the overhaul of the gearbox included a limitation of warranties and damages that provided for repair or replacement of the gearbox, but that excluded liability for any consequential or incidental damages. Thus, as to the first two defenses, Defendants seek summary judgment on all claims; as to the third defense Defendants seek summary judgment as to the tort claims; and as to the fourth defense Defendant American Eurocopter seeks summary judgment as to the contract claims.

In addition to the Motions for Summary Judgment, the parties have filed various procedural motions related to the summary judgment briefing. The Court will first address the procedural motions, and will then consider the substance of Defendants' Motions for Summary Judgment.

III.    PROCEDURAL MOTIONS

American Eurocopter filed a Brief in Support of Its Motion for Summary Judgment [Document #22] that, due to a formatting error, exceeded the applicable page limitation by three pages.  Plaintiff filed a Motion to Strike American Eurocopter's Summary Judgment Brief for Exceeding the Page Limit [Document #31].  American Eurocopter then filed a Motion for Leave to Exceed the Page Limit [Document #41].  American Eurocopter subsequently filed a duplicate Motion for Summary Judgment [Document #71] that was reformatted to be only 20 pages, and that would be necessary only if the motion for leave to exceed the page limit was denied.

After reviewing all of the motions, the Court finds that American Eurocopter's original Brief in Support of Its Motion for Summary Judgment should be allowed.  Therefore, Plaintiff's Motion to Strike [Document #31] is DENIED, Defendants' Motion for Leave to Exceed the Page Limit [Document #41] is GRANTED, and the Brief in Support of the Motion for Summary Judgment [Document #22] will be allowed as originally filed.  American Eurocopter's subsequent Motion for Summary Judgment [Document #71] will therefore be DENIED as moot.

Plaintiff has also filed a Motion to Strike Defendants' Reply Brief [Document #61] because Plaintiff contends that the Reply Brief goes beyond simply replying to Plaintiff's Response. However, the Reply Brief addresses the arguments raised in the original Motions for Summary Judgment and in Plaintiff's Response.  Therefore, Plaintiff's Motion to Strike the Reply Brief [Document #61] is DENIED.

On June 21, 2005, the Court held a settlement conference between the parties whereupon the legal positions of the parties were briefly discussed and made clear.  Subsequently, on June 24, 2005, Plaintiff filed a Motion for Leave to File a Supplemental Brief in Opposition to Defendants'

Motions for Summary Judgment [Document #126]. Defendants filed a Response [Document #142] objecting to Plaintiff's request to file a supplemental brief. The Motions for Summary Judgment were referred to this Court on March 29, 2005, and this case has been scheduled for trial beginning July 11, 2005. The Court finds that to allow Plaintiff leave to file a Supplemental Brief at this time would not allow for sufficient time for Defendants to fully respond to the Supplemental Brief or for this Court to consider the additional arguments prior to trial. Moreover, the Court has resolved the Motions for Summary Judgment without reaching the issues raised in Plaintiff's Supplemental Brief. Therefore, Plaintiff's Motion for Leave to File a Supplemental Brief [Document #126] is DENIED.

Finally, the Court notes that the parties have filed multiple motions to strike and motions in limine relating to evidence and expert witnesses to be presented at trial. However, the Court will not address those motions in this Memorandum Opinion. Instead, the Court will hear those motions and make any necessary determinations on those issues at the trial in this matter, consistent with the determinations in this Opinion.[2]

IV.    DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is

---

[2] The Court notes that as to one of Plaintiff's proposed expert witnesses, Mr. Stimpson, Defendants have filed a Motion to Strike based on the fact that Plaintiff refused to allow Mr. Stimpson to be deposed. Under Fed. R. Civ. P. 26(b)(4), "[a] party may depose any person who has been identified as an expert whose opinions may be presented at trial." Based on the evidence presented by the parties at this time, it appears that Plaintiff, in violation of the Federal Rules, simply refused to allow Mr. Stimpson to be deposed, to Defendants' prejudice. However, the Court will allow the parties to be heard on this motion and on the other evidentiary issues at the trial in this matter.

considered "material" if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). There can be "no genuine issue as to any material fact" if the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case," since "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed.2d 265 (1986). Under this standard, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510. As a result, the Court will only enter summary judgment in favor of the moving party when " 'the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the [nonmoving] party cannot prevail under any circumstances.' " Campbell v. Hewitt, Coleman & Assocs., 21 F.3d 52, 55 (4th Cir. 1994) (quoting Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co., 381 F.2d 245, 249 (4th Cir. 1967)). When ruling on a summary judgment motion, the Court "view[s] the evidence in the light most favorable to the non-moving party, granting that party the benefit of all reasonable inferences." Bailey v. Blue Cross & Blue Shield, 67 F.3d 53, 56 (4th Cir. 1995). The moving party bears the initial "burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law." Catawba Indian Tribe v. South Carolina, 978 F.2d 1334, 1339 (4th Cir. 1992)(en banc).

As noted above, Defendants have moved for summary judgment based on the following contentions: (1) the alleged misconduct by the Defendants was not the proximate cause of the crash; (2) Plaintiff's product liability claims are barred pursuant to North Carolina General Statute § 99B-3

and § 99B-4 due to the pilot and mechanic's alteration or misuse; (3) Plaintiff's tort claims are barred by the "economic loss doctrine"; and (4) Plaintiff's contract claims fail because the contract for the overhaul of the gearbox included a limitation of warranties and damages. The Court will consider each of these contentions in turn.

A.    Proximate Cause

Defendants contend that they are entitled to summary judgment on all claims because even if the gearbox was defective or negligently overhauled, that defect was not the proximate cause of the crash. Defendants contend that the alleged negligence of the pilot and mechanic when they decided to fly the helicopter back to Duke after the warning light came on was an independent, intervening cause of the accident. In Defendants' view, the proximate cause of the crash was the decision by the pilot and mechanic to disable the warning light and fly the helicopter back to Duke, and therefore the gearbox, even if defective, was not the proximate cause of the crash as a matter of law.

However, under North Carolina law, there may be more than one proximate cause of an injury. When two or more proximate causes join and concur in producing an injury, the tortfeasors are jointly and severally liable. See Hairston v. Alexander Tank & Equipment Co., 310 N.C. 227, 236, 311 S.E.2d 559, 566-67 (1984). In Hairston, a motorist ended up on the side of the road when the tires on his new car came off while he was driving, apparently because the car dealer had failed to tighten the new tires sufficiently. While the motorist was standing on the side of the road, a truck driver negligently struck the motorist. The motorist sued the truck driver and the car dealer. The car dealer moved for judgment as a matter of law based on the contention that the proximate cause of the accident was the truck driver, not the tire problem. However, the North Carolina Supreme

Court held that the truck driver's negligence did not insulate the prior negligence of the car dealer as a matter of law.

In defining an "insulating cause," the North Carolina Supreme Court held that "[a]n efficient intervening cause is a new proximate cause which breaks the connection with the original cause and becomes itself solely responsible for the result in question. It must be an independent force, entirely superseding the original action and rendering its effect in the causation remote. It is immaterial how many new elements or forces have been introduced, if the original cause remains active, the liability for its result is not shifted." Hairston, 310 N.C. at 236, 311 S.E.2d at 566-67. The test to determine whether the negligent conduct is insulated by the negligence of another is "reasonable unforeseeability on the part of the original actor of the subsequent intervening act and resultant injury." Id. at 237, 311 S.E.2d at 467. However, the original tortfeasor need not have been able to forsee "the injury in the precise form in which it actually occurred. All that the plaintiff is required to prove on the question of foreseeability, in determining proximate cause, is that in 'the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected.'" Hairston, 310 N.C. at 233-34, 311 S.E.2d at 565 (quoting Hart v. Curry, 238 N.C. 448, 449, 78 S.E.2d 170, 170 (1953)); see also Harton v. Forest City Tel. Co., 141 N.C. 455, 464, 54 S.E. 299, 302 (1906) (holding that the original negligence "will not be considered too remote if, according to the usual experience of mankind, the result ought to have been apprehended"); Riddle v. Artis, 243 N.C. 668, 672, 91 S.E.2d 894, 897 (1956) ("Ordinarily, 'the connection is not actually broken if the intervening event is one which might in the natural and ordinary course of things, be anticipated as not entirely improbable, and the defendant's negligence is an essential link in the chain of

-10-

causation.'" (internal citations omitted)); <u>Johnson v. Skinner</u>, 99 N.C. App. 1, 13, 392 S.E.2d 634, 641 (1990) ("[A] defendant may be liable despite the negligent act of another if at the time of his act he is on notice of circumstances that make the intervention of others likely . . . [and] reasonable people must anticipate . . . occasional negligence which is one of the incidents of human life." (internal quotations omitted)). This determination is an inference of fact and is "ordinarily a question for the jury." <u>Hairston</u>, 310 N.C. at 235, 311 S.E.2d at 565.

The Federal District Court for the Western District of North Carolina summarized these rules as follows:

1.  Under accepted North Carolina law, the proximate cause of an injury is a factual question for the jury, rather than a question of law for the court.
2.  There may be more than one proximate cause of an injury.
3.  If the negligence of an actor is a proximate cause of any part of the injuries, he is liable for that part.
4.  Defendants' negligence, in order to be actionable, need not be the sole proximate cause of injury, nor the last act of negligence.
5.  If the intervening act of a third person is reasonably foreseeable, it does not insulate a previously negligent party from liability for injuries caused by or contributed to by that previous negligence. . . .

<u>Martin v. Smith</u>, 534 F. Supp. 804, 806-07 (W.D.N.C. 1982) (citations omitted).

Thus, under North Carolina law in the present case, even if the mechanic and pilot were determined to be negligent, and even if their negligence were a proximate cause of the crash, American Eurocopter would still be liable if its own negligence contributed to the crash and if it was foreseeable that the mechanic and pilot might try to return the helicopter to Duke for repairs after the warning light illuminated and the helicopter had landed. As established by the North Carolina Supreme Court in <u>Hairston</u>, "[t]he well-settled rule in this jurisdiction is that except in cases so clear that there can be no two opinions among men of fair minds, the question should be left for the jury to determine whether the intervening act and the resultant injury were such that the author of the

-11-

original wrong could reasonably have expected them to occur as a result of his own negligent act."

<u>Hairston</u>, 310 N.C. at 238, 311 S.E.2d at 567. In this case, as in <u>Hairston</u>, the actions by the mechanic and pilot were not "so highly improbable and extraordinary an occurrence in this series of events as to bear no reasonable connection to the harm threatened by" American Eurocopter's alleged original negligence. <u>Id.</u>

Thus, the Court finds that there is a factual question whether the pilot and mechanic were in fact negligent and whether their actions were an intervening, insulating cause of the crash, and these factual questions are for the jury to determine. In this case, the evidence is not so conclusive to establish as a matter of law that the allegedly defective gearbox was not a proximate cause of the crash. Therefore, summary judgment on this basis is not appropriate.[3]

B.    Product Liability Defenses for Alteration or Misuse

1.    North Carolina's Products Liability Act

Defendants next contend that they are entitled to summary judgment on all claims based on affirmative defenses provided by North Carolina's Products Liability Act. North Carolina's Products Liability Act is codified in North Carolina General Statute Chapter 99B and covers "any

---

[3] The Court notes that North Carolina law provides for contribution among joint tortfeasors. <u>See</u> N.C. Gen. Stat. § 1B-1. Although not an issue in the present case, if American Eurocopter pursues a separate contribution action against CJ and establishes that the mechanic and pilot were also negligent and were a contributing cause to the crash, CJ would be required to pay its pro rata share, or 50%, of any judgment that may have been entered against American Eurocopter. <u>See</u> N.C. Gen. Stat. § 1B-2 (providing that "[i]n determing the pro rata shares of tort-feasors in the entire liability . . . [t]heir relative degree of fault shall not be considered."); <u>see also</u> <u>State Farm Mut. Auto. Ins. Co. v. Holland</u>, 324 N.C. 466, 471, 380 S.E.2d 100, 103 (1989) (noting that "where one of the joint tortfeasors is not made a party to the original action, either by the plaintiff or the original defendant, the original defendant may nevertheless, by separate action, seek contribution from the other tortfeasor. In such a case he must establish, not only that a judgment has been entered against him, but that the other party is in fact a joint tortfeasor, that is, that the other party is liable jointly with the original defendant to the plaintiff.").

action brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, testing, listing, certifying, warning, instructing, marketing, selling, advertising, packaging, or labeling of any product." N.C. Gen. Stat. § 99B-1. North Carolina does not recognize strict products liability. See N.C. Gen. Stat. § 99B-1.1. Instead, "a products liability plaintiff may base the claim on various causes of action, including negligence (negligent design, manufacture, assembly, or failure to provide adequate warnings) and breach of warranty." Moore v. Coachmen Indus., 129 N.C. App. 389, 397, 499 S.E.2d 772, 777 (1998).

The defenses provided for in Chapter 99B apply to any products liability claim, including a breach of warranty claim. See N.C. Gen. Stat. § 99B-1.2.[4] In the present case, Defendants contend that they are entitled to summary judgment on all of Plaintiff's claims because the defenses provided in Chapter 99B provide them with an affirmative defense as a matter of law. Under North Carolina General Statutes § 99B-3, "[n]o manufacturer or seller of a product shall be held liable in any product liability action where a proximate cause of the personal injury, death, or damage to property was either an alteration or modification of the product by a party other than the manufacturer or seller." N.C. Gen. Stat. § 99B-3. An alteration or modification "includes changes in the design, formula, function, or use of the product from that originally designed, tested, or intended by the manufacturer." N.C. Gen. Stat. § 99B-3. In addition, North Carolina General Statute § 99B-4 further provides that "[n]o manufacturer or seller shall be held liable in any product liability action if: (1) The use of the product giving rise to the product liability action was contrary

---

[4] The Court notes, however, that Defendants contend that Texas contract law applies to the contract claims. To the extent that the breach of warranty claims arise under Texas law, the North Carolina Products Liability Act defenses would not apply as defenses to those contract claims.

to any express and adequate instructions or warnings delivered with, appearing on, or attached to the product or on its original container or wrapping, if the user knew or with the exercise of reasonable and diligent care should have known of such instructions or warnings; or (2) The user knew of or discovered a defect or dangerous condition of the product that was inconsistent with the safe use of the product, and then unreasonably and voluntarily exposed himself or herself to the danger, and was injured by or caused injury with that product; or (3) The claimant failed to exercise reasonable care under the circumstances in the use of the product, and such failure was a proximate cause of the occurrence that caused the injury or damage complained of." N.C. Gen. Stat. § 99B-4.[5]

Plaintiff contends that these defenses do not apply because the pilot and mechanic were independent contractors employed by CJ and were not agents of Duke. Plaintiff also contends that there is a genuine issue of material fact regarding whether the pilot and mechanic altered or modified the allegedly defective product in this case, or acted unreasonably in flying the helicopter back to Duke after the warning light illuminated. Finally, Plaintiff contends that even if the mechanic did alter or misuse the product, the mechanic was actually acting as an agent of American

---

[5] Plaintiff asserts that these defenses should not apply because American Eurocopter was not a "manufacturer" or "seller" of a product, and because the overhaul involved repair services, not a "product." However, these assertions are inconsistent with the essence of Plaintiff's product liability claims, in which Plaintiff claims that a defect in the helicopter components caused the crash. (See Compl. ¶¶ 31-56). In the Complaint, Plaintiff specifically alleges that Defendant American Eurocopter "manufactured and introduced into the stream of commerce" the overhauled gearbox. (Compl. ¶ 20). The apparent inconsistency in Plaintiff's contentions may ultimately affect the viability of Plaintiff's product liability claims, if the Court accepts Plaintiff's contention that no product is involved. The parties, however, have not addressed this issue in their summary judgment briefing, and the Court will not at this time deem Plaintiff to have abandoned its product liability claims based on these inconsistent contentions.

Eurocopter based on the fact that CJ was an Authorized Service Center for American Eurocopter.[6]

Defendants contend that there is no issue of material fact regarding the mechanic's alteration or misuse of the product because the mechanic's decision to disable the warning light and send the helicopter back to Duke for repairs was an alteration or misuse as a matter of law. Defendants further contend that the pilot and mechanic were not agents of American Eurocopter and were in fact agents of Duke, and that even if they were independent contractors, their alteration or misuse of the product bars liability under the North Carolina Product Liability Law.[7] Because both parties' contentions raise the question of a potential agency relationship – either between CJ and American Eurocopter, or between CJ and Duke – the Court will turn to a consideration of the rules for establishing an agency relationship under North Carolina law.

2.     Establishment of "Agency" under North Carolina Law

Under North Carolina law, agency is defined as "the relationship which arises from 'the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" Hayman v. Ramada Inn, Inc., 86 N.C. App. 274, 277, 357 S.E.2d 394, 397 (1987) (quoting Colony Assocs. v. Fred L. Clapp & Co., 60 N.C. App. 634, 637-38, 300 S.E.1d 37, 39 (1983)). The existence of an agency relationship "depends on the degree of control retained by the principal over the details of the work as it is being performed. The

---

[6] If the pilot and mechanic were agents of American Eurocopter, their actions would be imputed to American Eurocopter, and their actions, therefore, could not provide a defense for American Eurocopter.

[7] If the pilot and mechanic are determined to be agents of Duke, and if the jury determines that they were negligent and that their negligence contributed to the crash, the doctrine of contributory negligence would bar any negligence claims by Duke against Defendants under North Carolina law.

controlling principle is that [agency] arises from the right of supervision and control.'" Id. (quoting

Vaughn v. North Carolina Dep't of Human Resources, 296 N.C. 683, 686, 252 S.E.2d 792, 795)

(1979)). When the parties operate pursuant to a License Agreement, such as a franchisee-franchisor

relationship, "the existence of an agency relationship . . . is determined by the nature and extent of

control and supervision retained and exercised by the franchisor over the methods or details of

conducting the day-to-day operations." Id. In general, under North Carolina law, if a franchisor

provides certain standards for operations and retains a right of inspection but does not maintain

daily control over the franchisee's operations, no agency relationship exists, and the franchisee is

an independent contractor. See, e.g., id.; Miller v. Piedmont Steam Co., 137 N.C. App. 520, 528

S.E.2d 923 (2000). However, the extent of daily control is often a factual question, and "[u]nless

there is but one inference that can be drawn from the facts, whether an agency relationship exists

is a question of fact for the jury." Hylton v. Koontz, 138 N.C. App. 629, 635, 532 S.E.2d 252, 257

(2000); see also Crinkley v. Holiday Inns, Inc., 844 F.2d 156, 166-67 (4th Cir. 1988) (finding that

under North Carolina law, a franchisee may be an agent of the franchisor based on "apparent

authority").

        In the present case, CJ employed the pilot and mechanic and contracted with Duke to

maintain and operate the helicopters. However, CJ also contracted with American Eurocopter, and

allegedly performed maintenance and operations as specifically trained and directed by American

Eurocopter. At this time, the Court concludes that based on the nature of the agreements among

the parties, it appears that CJ was an independent contractor, but there are genuine issues of fact

regarding the specific degree of control exercised by both Duke and American Eurocopter over CJ.

Given the case law cited above, the Court concludes that summary judgment on this issue is not

appropriate at this time, since there is insufficient evidence to determine the existence or scope of any agency relationship – either between CJ and American Eurocopter or between CJ and Duke – as a matter of law.[8]

Moreover, the Court notes that even if the pilot and mechanic are determined to be independent contractors and not agents of American Eurocopter, the provisions of North Carolina General Statute § 99B-3 and § 99B-4 would not necessarily provide a defense to American Eurocopter. As discussed below, those defenses would not apply in certain situations where American Eurocopter contracted to provide training or assistance to CJ, and the Court will therefore turn to a consideration of the scope of the Chapter 99B defenses under North Carolina law.

      3.      Products Liability Defenses for Acts of a Third Party Trained or Assisted by the Manufacturer

Under North Carolina and Fourth Circuit case law, North Carolina General Statute § 99B-3 and § 99B-4 would bar liability on the part of a manufacturer if a third party altered, misused, or improperly installed the product, or failed to follow express and adequate warnings and instructions, "but only if the manufacturer has not 'contracted to instruct [the contractor] on installation procedures, and . . . in fact assisted [the contractor] in the installation.'" Lienhart v. Dryvit Sys.,

_____

[8] To the extent the parties have filed motions in limine with respect to evidence regarding the existence of an agency relationship, the Court will allow the parties to be heard at trial, and if necessary will conduct a brief hearing outside the presence of the jury to determine whether there is sufficient evidence of an agency relationship between CJ and American Eurocopter to allow this issue to be submitted to the jury. This determination would include consideration of both actual authority or apparent authority, based not only on the Service Center Agreement but also on the degree of control exercised by American Eurocopter over CJ and the authority represented to third parties by American Eurocopter. There is insufficient evidence as to these issues to make any summary determination at this time.

Inc., 255 F.3d 138, 148 (4th Cir. 2001). In Lienhart, the Fourth Circuit held that if the manufacturer of stucco siding "contracted to instruct third parties and assisted those third parties in installing [the product], the third parties' failure to follow instructions cannot provide [the manufacturer] with an affirmative defense to liability under North Carolina law." Id. This holding was based on a decision of the North Carolina Supreme Court in which the North Carolina court held that a manufacturer of a roofing system could be held liable under Chapter 99B for products liability when its roofing system was improperly installed by an authorized installer. Westover Products, Inc. v. Gateway Roofing Co., Inc., 94 N.C. App. 63, 380 S.E.2d 369 (1989). In that case, the contract between the manufacturer and the authorized contractor stated that the manufacturer would provide instruction and training on proper installation in order to assure adequate quality and uniformity, and would provide technical assistance and advice. The North Carolina Supreme Court held that the provisions of § 99B-4 would not bar liability against the manufacturer where the manufacturer "contracted to instruct [the contractor] on installation procedures, and . . . in fact assisted [the contractor] in the installation of the roof." Id. at 71, 380 S.E.2d at 374.

Thus, under the applicable case law, the defenses of § 99B-3 and § 99B-4 would not apply if American Eurocopter contracted with CJ to train and assist CJ in the installation and maintenance of the product at issue (the allegedly defective gearbox). Therefore, even if CJ was not an agent of American Eurocopter, American Eurocopter would not be relieved of liability for CJ's alleged alteration or misuse of the gearbox or failure to follow instructions or warnings related to the gearbox, if American Eurocopter had contracted to train CJ and assisted CJ with respect to the gearbox. In the present case, CJ entered into a Service Center Agreement with American Eurocopter, pursuant to which American Eurocopter provided standards and training for CJ

-18-

mechanics.  Under these circumstances, the Court concludes that there is a genuine issue of fact regarding the relationship between American Eurocopter and CJ and the extent to which American Eurocopter agreed to provide training and assistance to CJ in the installation and maintenance of the gearbox.  Because there is not sufficient evidence to make this determination as a matter of law, summary judgment is inappropriate at this time.

> 4. Other Issues of Material Fact with Respect to the Products Liability Defenses

Finally, the Court notes again that there is a genuine issue of fact for the jury whether the mechanic and pilot's decision to disconnect the warning light did, in fact, alter or misuse the gearbox  and whether that misuse was a proximate cause of the injury.  See, e.g., Hastings ex rel. Pratt v. Seegars Fence Co., 128 N.C. App. 166, 169-70, 493 S.E.2d 782, 784-85 (1997) (noting that "in order for G. S. § 99B-3 to bar plaintiff's recovery, the [alteration or misuse] must have been a proximate cause of her injury" and "[i]ssues of proximate cause and foreseeability, involving application of standards of conduct, are ordinarily best left for resolution by a jury under appropriate instructions from the court.").  The issue remains then as to whether there was an improper alteration or misuse of the gearbox by the pilot or mechanic under the provisions of N.C. Gen. Stat. § 99B-3.

To the extent that Defendants contend that the mechanic and employee failed to heed an adequate warning when they chose to fly the helicopter back to Duke, the Court also notes that there is evidence within the Flight Manuals which indicated that a pilot should "[l]and as soon as possible" when the oil pressure warning illuminates, but further provided in the same provision that the gearbox "has successfully passed a bench test consisting in running the gearbox for 45 minutes with zero oil pressure, at the power corresponding to minimum power in level flight."  This

reference creates at least some question as to whether the pilot and mechanic failed to heed an adequate warning or unreasonably exposed themselves to known danger, since the warning as described in the Flight Manual would indicate that the helicopter could be flown for up to 45 minutes, even after the oil pressure warning light illuminated. Thus, an issue remains whether the pilot and mechanic used the product contrary to express and adequate instructions or acted unreasonably under the provisions of N.C. Gen. Stat. § 99B-4. Therefore, on this basis as well, the Court concludes that summary judgment is inappropriate on this particular affirmative defense claimed by Defendants.

      C.     Economic Loss Doctrine

Defendants next contend that Plaintiff's claims for the damage to the helicopter itself are precluded by the "economic loss doctrine." "North Carolina has adopted the economic loss rule, which prohibits recovery for economic loss in tort. Instead, such claims are governed by contract law." Moore v. Coachmen Indus., 129 N.C. App. 389, 401, 499 S.E.2d 772, 780 (1998). The economic loss doctrine is a judicially-created tool to attempt to protect contract law from being overrun by the concepts of tort law, except in cases where tort principles of risk should apply. "The rationale for the economic loss rule is that the sale of goods is accomplished by contract and the parties are free to include, or exclude, provisions as to the parties' respective rights and remedies, should the product prove to be defective." Moore, 129 N.C. App. at 401-02, 499 S.E.2d at 780. However, under North Carolina law, "[w]here a defective product causes damage to property other than the product itself, losses attributable to the defective product are recoverable in tort rather than contract." Moore, 129 N.C. App. at 401-02, 499 S.E.2d at 780. "The distinction that the law makes between recovery in tort for physical injuries and recovery in warranty for economic loss is

-20-

hardly arbitrary. It rests upon an understanding of the nature of the responsibility a manufacturer must undertake when he distributes his products. He can reasonably be held liable for physical injuries caused by defects by requiring his products to match a standard of safety defined in terms of conditions that create unreasonable risks of harm or arise from a lack of due care." 2000 Watermark Ass'n, Inc. v. Celotex Corp., 784 F.2d 1183, 1186 (4th Cir. 1986). Thus, tort concepts of safety and risk apply when a manufacturer negligently produces products that are dangerous to people or other property, and the manufacturer is responsible for injuries caused by his negligence. However, this rationale does not apply where a manufacturer's products simply fail to "meet the business needs of his customers." Id.

In the present case, Defendants contend that Plaintiff's negligence claims are barred by this economic loss doctrine.[9] In analyzing this contention, the Court notes that there are two separate Defendants, each with its own relevant contract. As to Defendant E.S.A.S., Plaintiff brings claims for negligent design and manufacture of the helicopter, defects in the helicopter itself, and negligent failure to warn regarding problems with the helicopter or its components. The economic loss doctrine may be implicated with respect to these claims because in 1992, Duke purchased the

_____

[9] Plaintiff also brings claims for "misrepresentation" based on the assertion that American Eurocopter "knew or should have known" that the gearbox was not, in fact, airworthy, and the Complaint includes a demand for punitive damages. However, the parties did not attempt to address the impact of this claim on the application of the economic loss doctrine until the proposed Supplemental Briefing filed recently. Because Defendants have not had an adequate opportunity to respond on this point, the Court will not reach this issue at this time. However, the Court notes that as a general principle under North Carolina law, claims for fraud take a claim beyond a simple breach of contract. See, e.g., 2000 Watermark Assoc., 784 F.2d at 1185 ("[H]istorically the only tort action available to the disappointed purchaser suffering an intangible commercial loss was an action for fraud."); see also Mosley & Mosley Builders, Inc. v. Landin, Ltd., 97 N.C. App. 511, 389 S.E.2d 576 (1990) (noting the distinction between simple breach of contract and claims involving fraud or deception in claim for Unfair and Deceptive Trade Practices under N.C. Gen. Stat. § 75-1.1).

helicopter as manufactured by E.S.A.S., and the terms of that purchase included specific contractual warranties. As to Defendant American Eurocopter, Plaintiff brings negligence claims for the alleged defects in the main gearbox as manufactured and introduced into the stream of commerce by American Eurocopter, as well as claims for negligent overhaul and repair, negligent failure to warn, and negligence per se for violating safety standards in the manufacture and testing of the main gearbox. The economic loss doctrine may be implicated with respect to these claims because CJ purchased the overhauled gearbox from American Eurocopter in 2000, and the terms of that purchase included specific warranty provisions governing the sale. In evaluating whether these claims sound only in contract law, or also implicate tort law, the Court notes that much of the parties' dispute turns on whether the helicopter as a whole is considered to be the "defective product," for which recovery should be confined to contract law, or whether the gearbox (or parts contained in the gearbox) would be the "product" so that damage to any property other than the gearbox (including damage to the helicopter itself) could be recovered in tort.

In order to analyze the impact of the economic loss rule with respect to these claims, the Court will first review the general contours of the economic loss rule in North Carolina. The Court will then consider the similar rules adopted by the United States Supreme Court sitting in admiralty jurisdiction, particularly as to the issue of how the economic loss rule should be applied when "component parts" are incorporated into another product. The Court will then compare these rules and analyze the North Carolina case law with respect to the issue of "component parts," in order to determine what approach the North Carolina courts are likely to adopt when a part (such as the gearbox) is sold separately as a finished product but is then used in conjunction with what may be "other property" (such as the helicopter). Finally, the Court will then apply these rules to the facts

-22-

of the present case to determine which of Plaintiff's claims, if any, will be barred by the economic loss rule.

### 1. General Contours of the Economic Loss Rule in North Carolina

In North Carolina, the economic loss rule is grounded in the historical principle that "[a] tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to properly perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract." Kaleel Builders, Inc. v. Ashby, 161 N.C. App. 34, 43, 587 S.E.2d 470, 476 (2003) (quoting Spillman v. American Homes of Mocksville, Inc., 108 N.C. App. 63, 65, 422 S.E.2d 740, 741-42 (1992)). However, there are categorical exceptions to this rule under North Carolina law, including where "(1) The injury, proximately caused by the promisor's negligent act or omission in the performance of his contract, was an injury to the person or property of someone other than the promisee. . . . [or] (2) The injury, proximately caused by the promisor's negligent, or wilful, act or omission in the performance of his contract, was to property of the promisee other than the property which was the subject of the contract, or was a personal injury to the promisee." Kaleel Builders, 161 N.C. App. at 42-43 n.1, 587 S.E.2d at 476 n.1 (quoting North Carolina State Ports Authority v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 82, 240 S.E.2d 345, 350-51 (1978), rejected in part on other grounds by Trustees of Rowan Tech. v. Hammond Assoc., 313 N.C. 230, 328 S.E.2d 274 (1985)); see also Shoffner Indus., Inc. v. W. B. Lloyd Constr. Co., 42 N.C. App. 259, 265, 257 S.E.2d 50, 55 (1979) ("It is well settled in North Carolina that where a contract between two parties is intended for the benefit of a third party, the latter may maintain an action in contract for its breach or in tort if he has been injured as a result of its negligent performance.").

-23-

The North Carolina courts have applied the economic loss doctrine in both commercial and consumer transactions, and without regard to whether the product failed in a sudden or calamitous manner.  See Moore, 129 N.C. App. at 401-02, 499 S.E.2d at 779-80.  Instead, where a defective product fails, North Carolina courts have focused on the nature of the resulting injury, and specifically whether the defective product causes "damage to property other than the product itself." Id.  Thus, negligence claims under North Carolina law for damage to the product itself are precluded by the economic loss rule in North Carolina, but damage to "other property" may be recovered in tort.  See id.; see also Reece v. Homette Corp., 110 N.C. App. 462, 466, 429 S.E.2d 768, 770 (1993) (holding that the economic loss doctrine precludes recovery where the plaintiff seeks damages only for "the very product manufactured by defendant [but] [t]his claim is substantially different from a claim arising from a factual situation where the manufactured product causes physical injury to a person or to property other than the manufactured product itself."); Spillman v. American Homes of Mocksville, Inc., 108 N.C. App. 63, 65, 422 S.E.2d 740, 742 (1992) (holding that the economic loss doctrine precludes tort recovery "when the injury resulting from the breach is damage to the subject matter of the contract.").[10]

---

[10] In interpreting the proper scope of the economic loss doctrine, courts applying the law of states outside North Carolina have applied tests that are different than these North Carolina law rules, at least in part because state law varies considerably in the area of products liability.  For example, North Carolina has specifically rejected the notion of strict product liability, and recognizes product liability claims based only on negligence or breach of warranty.  See N.C. Gen. Stat. § 99B-1.1.  Thus, a party bringing a breach of warranty claim is constrained by general contract principles (with some statutory lessening of the privity requirement), while a party bringing a negligence claim is constrained by general tort principles and by the historical principle that there can be no tort recovery for a breach of contract, and the similar economic loss rule that there can be no tort recovery for "economic losses," unless one of the exceptions exists based on personal injury or damage to other property.  Of course, a negligence claim also requires that the plaintiff demonstrate actual negligence that proximately caused the plaintiff's injury.  Other states have adopted more sweeping product liability provisions, and courts have then used the economic loss

2.	U.S. Supreme Court's Analysis of the Economic Loss Rule under Federal Admiralty Law

The United States Supreme Court, sitting in admiralty law, has adopted a similar rule to that expressed in North Carolina law and has held that the distinction between tort law and contract law rests "on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products" and "[d]amage to a product itself is most naturally understood as a warranty claim." East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 871-72, 106 S. Ct. 2295, 2302, 90 L. Ed. 2d 865 (1986). In East River, the defendant supplied turbines for the plaintiff's supertankers. The Supreme Court found that the turbines were supplied as "an integrated package," and each was "properly regarded as a single unit." Id. Components of the turbines failed and caused damage to other parts of the turbines. In that case, the economic loss doctrine barred the plaintiff's product liability claims because the claims were only for damage to the turbines themselves. Id.

In a subsequent decision, the Supreme Court further addressed the question of what property would be considered the "product itself" and what property would be considered "other

---

rule to constrain that broad liability, particularly between commercial entities. See, e.g., Palmetto Linen Serv., Inc. v. U.N.X., Inc., 205 F.3d 126 (4th Cir. 2000) (interpreting economic loss rule in a commercial transaction under South Carolina law to preclude recovery for injury to not only the product itself but also "other property" reasonably contemplated by the parties to a contract); Redman v. John D. Brush & Co., 111 F.3d 1174, 1182 (4th Cir. 1997)(stating that under Virginia law, "an economic loss is a loss that flows from the failure of the product to perform as expected"). However, North Carolina courts have clearly held that the application of the economic loss rule in this state depends upon the existence of injury to a person or to property other than the product itself, and given the historical basis for this rule and the more limited nature of product liability claims in North Carolina, there is no basis to anticipate that the North Carolina state courts would redefine this rule. Cf. Ellis-Don Constr., Inc. v. HKS, Inc., 353 F. Supp. 2d 603, 606 (M.D.N.C. 2004) (holding that in North Carolina, the economic loss rule is "firmly rooted in traditional concepts of warranty and contract law" but has not been expanded beyond those traditional notions by North Carolina courts).

property" for purposes of the economic loss rule.  See Saratoga Fishing Co. v. J. M. Martinac & Co., 520 U.S. 875, 117 S. Ct. 1783, 138 L. Ed. 2d 76 (1997).  In Saratoga, the Supreme Court held that "[w]hen a manufacturer places an item in the stream of commerce by selling it to an Initial User, that item is the "product itself" under East River."  Id.  Based on this rule, the Supreme Court held that certain equipment added to a vessel after its purchase would be considered "other property." In reaching this conclusion, the Court noted that "[s]tate law often distinguishes between items added to or used in conjunction with a defective item purchased from a Manufacturer (or its distributors)" and "the case law does suggest a distinction between components added to a product by a manufacturer before the product's sale to a user . . . and those items added by a user to the manufactured product . . . . [W]e would maintain that distinction."  Id.

Thus, the Supreme Court has held that under federal admiralty law, the "product itself" is the finished product as distributed by a manufacturer into the stream of commerce for use, and if that product is subsequently used in conjunction with or as part of a larger item or system, the larger item or system constitutes "other property."  However, when component parts are provided by a manufacturer to another seller or manufacturer for incorporation into a finished product that then enters the stream of commerce, it is the finished product, not the component parts, which constitute the "product itself."  This issue is particularly relevant to the case presently before the Court, because the parties dispute whether the gearbox is the "product" or whether the helicopter is the "product" for purposes of the economic loss rule.  The Court will therefore turn back to a consideration of North Carolina law, as well as case law from various other states, to determine how the North Carolina courts might address this issue.

3.     Economic Loss Rule as Applied to "Component Parts" in North Carolina

The North Carolina courts have not specifically addressed the scope of the economic loss doctrine where a manufacturer or a third party provides a "replacement part" for an existing product.  However, North Carolina courts, like the Supreme Court, have focused on the "finished product" or the "manufactured product" as the "product itself."  As noted above, North Carolina courts have also indicated that where a contract governs the sale of a product, contract law governs the subject matter of the contract, but tort law applies to injuries to "other property" that are not the subject matter of the contract.

The North Carolina Court of Appeals applied these rules in Moore, in which an electrical system that was installed by the manufacturer as original equipment in a recreational vehicle malfunctioned and caused damage to the entire vehicle.  See Moore, 129 N.C. App. at 401, 499 S.E.2d at 780.  In that case, the North Carolina Court of Appeals held that the economic loss rule precluded a negligence claim for damage to the vehicle itself because the vehicle was the "finished product" that had been sold under warranty by the manufacturer.  The court noted that "plaintiffs bargained for a complete and functional recreational vehicle, not for wheels, electrical convertor box, stereo, etc.  Thus, they had no reasonable expectation that . . . any of the . . . manufacturers of unbranded components would resolve any problem they encountered with the vehicle."  Id.; see also Reece v. Homette Corp., 110 N.C. App. 462, 429 S.E.2d 768 (1993) (holding that where plaintiffs sued a mobile home manufacturer for defects in the mobile home that caused damage to the mobile home itself, the economic loss rule precluded recovery in tort because the mobile home was a finished product and the contract was for the mobile home itself); Spillman v. American Homes of Mocksville, Inc., 108 N.C. App. 63, 65, 422 S.E.2d 740, 742 (1992) (same); Land v. Tall

<u>House Bldg. Co.</u>, 165 N.C. App. 880, 602 S.E.2d 1, 4 (2004) (holding that where a plaintiff entered into a contract for general construction of a home, any damage to the home caused by the exterior finish system was damage to the house itself since the contract was for the home, not for the finish system, and negligence claims were therefore barred by the economic loss rule); <u>cf.</u> <u>Red Hill Hosiery Mill, Inc. v. Magnetek, Inc.</u>, 138 N.C. App. 70, 530 S.E.2d 321 (2000), <u>appeal after remand at</u> 159 N.C. App. 135, 582 S.E.2d 632 (2003) (holding that where a separately-purchased light fixture allegedly malfunctioned and caused a fire in the building in which the light fixture was installed, the product for purposes of the product liability determination was the light fixture, although not specifically considering the economic loss rule); <u>Byrd Motor Lines, Inc. v. Dunlop Tire & Rubber Corp.</u>, 63 N.C. App. 292, 304 S.E.2d 773 (1983) (viewing separately-purchased tires as the "product" where the tires were installed on plaintiff's existing trucks and caused automobile accidents resulting in property damage to the trucks, although not specifically considering the economic loss rule).

Courts outside of North Carolina have taken various approaches in defining the specific contours of the "other property" exception to the economic loss rule. For example, the Court of Appeals for the Third Circuit has held that where the original manufacturer provides a replacement part that is contemplated by the original contract, and the replacement part is integrated into the finished product, that replacement part becomes part of the "product" and damage caused by the replacement part to the original product is damage to the "product itself." <u>See</u> <u>Sea-Land Service, Inc. v. General Electric Co.</u>, 134 F.3d 149, 153 (3d Cir. 1998); <u>see also</u> <u>Agrotors, Inc. v. Bell Helicopter Textron, Inc.</u>, 2004 WL 2039954 (E.D. Pa. Sept. 9, 2004) (holding that any replacement part becomes part of the pre-existing "product"). However, the Third Circuit in <u>Sea-Land</u>

specifically "distinguish[ed] from the product additional parts that are not encompassed in the original bargain but are subsequently acquired. These should not be integrated." Id. Other courts have considered these various approaches and have held that a separately-purchased replacement part does not become part of the previously-purchased property. See, e.g., Mountain West Helicopter, LLC v. Kaman Aerospace Corp., 310 F. Supp. 2d 459, 466 (D. Conn. 2004) (holding that where a helicopter owner replaced the helicopter's clutch assembly with a new clutch assembly at the manufacturer's urging, and the new clutch assembly was defective and caused the helicopter to crash, the helicopter owner could bring a tort claim for the loss of the helicopter itself, which represented "damages for an injury to property other than the alleged defective product"); Transco Syndicate #1, Ltd. v. Bollinger Shipyards, Inc., 1 F. Supp. 2d 608, 611 (E.D. La. 1998) (holding that where plaintiff purchased a defective engine and incorporated it into a tug boat, and a defect in the engine caused a fire that consumed the boat, plaintiff could recover in tort for the loss to the boat as "other property," noting that the "object of the parties' contract constitutes the 'product' under East River"); Mays Towing Co. v. Universal Machinery Co., 755 F. Supp. 830, 833 (S.D. Ill. 1990) (holding that where plaintiff purchased engines and incorporated them into plaintiff's existing boat, the parties "bargained for the engines, not the construction of a vessel," and when the engines proved to be defective and destroyed themselves and the boat, any recovery for the engines themselves was in contract law, but recovery for the boat was "other property" that could proceed in tort).

Of course, many of these varying approaches stem from the variety of state law approaches to products liability claims. After reviewing all of the various approaches in light of North Carolina law, this Court believes that in applying the economic loss rule to component parts, North Carolina

-29-

courts would continue to focus on the "finished product" or "manufactured product" as sold into the stream of commerce to a user, even if the user, after purchasing the product, then uses that product in conjunction with other property. Thus, where property is already owned by a user, and a second manufacturer subsequently sells a separate product to that user pursuant to its own bill of sale, the "product" is the item as introduced into the stream of commerce by the second manufacturer, even if the product is used (by the user) in connection with or as part of his existing property. In the context of replacement parts that are integrated into a product already owned by the user, this Court finds that the approach most consistent with North Carolina law would recognize that where a user purchases a product (such as a light bulb) and then installs the product into other property already owned by the user (such as a light fixture in the user's pre-existing home), the product that is sold by the light bulb manufacturer into the stream of commerce to the user pursuant to its own terms of sale would constitute the "product itself." Thus, if the light bulb were negligently manufactured and as a result exploded, causing a fire that destroyed the user's home in which it was installed, the economic loss rule would not preclude the homeowner from pursuing a negligence claim against the light bulb manufacturer for the damage to his home. This approach is consistent with North Carolina's formulation of product liability principles and the economic loss doctrine, based on the scope of potential product liability under North Carolina law and the historical distinctions between tort and contract law. Having concluded that this is the rule the North Carolina courts would follow, the Court will therefore apply this rule to the claims brought in the present case.

4.    Application of this Economic Loss Rule to Plaintiff's Negligence Claims

In the present case, Duke entered an agreement in 1992 to purchase a helicopter manufactured by E.S.A.S., a French corporation. In a separate agreement in 2000, CJ ordered an overhauled gearbox for the helicopter from American Eurocopter, which is a separate corporate entity organized under the laws of Delaware with its principal place of business in Texas. Plaintiff brings claims against each of these two potential defendants: (1) negligence as to the helicopter itself as purchased from E.S.A.S. in 1992; and (2) negligence as to the overhauled gearbox as purchased from American Eurocopter in 2000. Since the analysis of these claims is different, the Court will consider them separately.

First, with respect to E.S.A.S., the subject matter of the parties' contract was the helicopter itself. The sale of that helicopter was governed by specific terms and conditions, and the helicopter itself was the "finished product" sold to Duke as the user in 1992. Therefore, with respect to any claims as to negligence with respect to the design of the helicopter itself, the Court finds that the helicopter was the "product" that was the subject of the parties' bargain, and any negligence claims against E.S.A.S. for negligent design or manufacture of the helicopter itself would be barred by the economic loss rule to the extent Plaintiff now seeks recovery for the helicopter itself from E.S.A.S.[11] However, any equipment added by Duke to the helicopter after the sale (such as medical equipment) would be "other property" (as recognized by the U.S. Supreme Court's decision in East River), and any damage to property on the ground where the helicopter crashed would be "other

---

[11] The parties have not addressed the question of whether there was a post-sale failure to warn regarding the helicopter or its components that would take these claims outside the scope of the economic loss doctrine and the Court therefore does not reach that issue in this opinion.

-31-

property."[12]  Under North Carolina law, damage to that "other property" could be the basis for a

negligence claim against E.S.A.S. if the Plaintiff is able to establish negligence by E.S.A.S. that

proximately caused the crash.[13]

As to Defendant American Eurocopter, the agreement between the parties covered the sale

of an overhauled gearbox that was manufactured and placed into the stream of commerce by

American Eurocopter, based on the evidence presently before the Court.  American Eurocopter

overhauled helicopter transmissions and sold one of the overhauled transmissions (as a gearbox)

to CJ for use in the helicopter.  Based on the evidence before the Court, the overhauled

transmissions were not manufactured by E.S.A.S., the helicopter manufacturer, but were instead

"manufactured and introduced into the stream of commerce" by American Eurocopter.  (Compl.

¶ 20).  Thus, the gearbox that was sold in 2000 was overhauled by a separate corporate entity

pursuant to a separate bill of sale and sent directly to the user.  That bill of sale included a limitation

of warranties that Defendants contend covers the terms of the agreement between the parties.

American Eurocopter charged $249,992.51 for the overhauled gearbox, and provided a limited

warranty for 9 months or 750 hours of flight time from the date of sale.  CJ obtained a credit toward

the price by sending the old helicopter gearbox to American Eurocopter in trade.

---

[12] The parties have not addressed the question of whether Plaintiff is a proper party to bring claims for damage to the property on the ground, where Plaintiff has paid the property owners for all of those losses.  Therefore, the Court will assume for purposes of this motion that Plaintiff is a proper party to pursue those losses.

[13] The Court notes that Defendant has not at this time challenged the sufficiency of Plaintiff's evidence regarding the negligent design or manufacture of the helicopter itself.  Therefore, those claims may go forward subject to Plaintiff's presentation of evidence sufficient to support the allegations that E.S.A.S. negligently designed or manufactured the helicopter.  In addition, as further discussed above, any recovery against E.S.A.S. would not include the loss of the helicopter itself pursuant to the economic loss rule.

-32-

Plaintiff contends that American Eurocopter was negligent for the following reasons: first, because the overhaul was negligent and resulted in a defective gearbox, second, because the overhauled gearbox negligently failed to comply with required FAA safety standards, and third, because American Eurocopter negligently failed to warn CJ or Duke regarding safety problems with the oil pumps contained in the gearbox. Plaintiff also contends that during testing of the gearbox, the oil pump exceeded heat limits and American Eurocopter used improper methods to cool the oil pump in an attempt to get the gearbox to pass the required safety testing. Based on these allegations, Plaintiff contends that American Eurocopter falsely represented that the gearbox was "airworthy."

Based on these facts as presented at this time, the Court finds that the subject matter of the contract between CJ and American Eurocopter was the overhauled gearbox, and the negligence claims against American Eurocopter are for negligence with respect to the gearbox. CJ negotiated for, and obtained, an overhauled gearbox, which was provided as a finished product with its own warranties and terms of sale. Although the gearbox did serve as a replacement part in the helicopter, it was manufactured by a different entity other than the original manufacturer, and there is no reason to conclude that the original sale of the helicopter in 1992 covered the separate sale of an overhauled gearbox by a separate entity eight years later.[14]

Based on these circumstances as alleged by the Plaintiff, the Court concludes that for purposes of the economic loss doctrine, as to the negligence claims against American Eurocopter,

---

[14] The 1992 terms and conditions of sale as to the helicopter itself provided limited warranties as to the helicopter itself and any optional equipment, spares, tools, or overhauled parts manufactured by E.S.A.S. However, the contract did not govern equipment or overhauled parts provided later by another manufacturer.

-33-

the "product itself" was the gearbox, and the helicopter was "other property" that was not the subject of the gearbox sales contract. Therefore, any negligence claim against American Eurocopter for damage to the gearbox itself would be precluded by the economic loss rule. However, the negligence claims against American Eurocopter for its alleged negligence in manufacturing and testing the gearbox could include damages for the loss of the helicopter and damage to property on the ground, if American Eurocopter's negligence is determined to be a proximate cause of those losses. This holding is consistent with the general theories of tort and contract law in North Carolina, since a party who negligently manufactures a helicopter transmission, negligently performs required safety testing, and falsely certifies that the transmission is "airworthy," and then contracts with a purchaser for the sale of the transmission, is properly held liable for the resulting damage if its negligence causes the destruction of the helicopter or other property used in connection with the transmission. General tort theories of risk and safety are applicable in such a situation.

To the extent that Defendants have moved for summary judgment on this issue, the Court has concluded that Plaintiff could assert claims for some damages against both E.S.A.S. and American Eurocopter based on the evidence as it presently appears before the Court. As to Plaintiff's claims that E.S.A.S. was negligent with respect to the helicopter's design, manufacture, or warnings, the economic loss rule would preclude recovery against E.S.A.S. for the loss of the helicopter itself, but not for the damage to property on the ground when the helicopter crashed. As to Plaintiff's claims that American Eurocopter was negligent with respect to the gearbox's manufacture, testing, or warnings, the economic loss rule would preclude recovery against American Eurocopter for the loss of the gearbox itself, but not for the damage to the helicopter or to the property on the ground. Because the economic loss rule would not preclude any of the claims in

their entirety, Defendants' motion for summary judgment on this basis will be denied. However, if the evidence as revealed at trial is consistent with the evidence presently before the Court,[15] the jury will be appropriately instructed regarding potential measures of damages against each Defendant based on the conclusions outlined above.[16]

D.    Breach of Contract Claims

Finally, Defendant American Eurocopter contends that Plaintiff's breach of contract claims should be dismissed because the contract for the sale of the overhauled gearbox expressly limited the remedies to repair or replacement of the gearbox. In order to evaluate this contention, the Court will first outline the parties' contentions, and will then summarize the terms of the relevant contracts. The Court will then consider Defendant's contention that CJ and Duke failed to comply with the applicable warranty requirements. Finally, the Court will consider whether there is evidence to indicate that the limited warranty provided by American Eurocopter failed of its essential purpose.

---

[15] If the evidence at trial reveals significant differences with respect to the relationship between the parties and the scope of the relevant contracts, the Court will allow the parties the opportunity to address the applicability of the economic loss doctrine, as outlined herein, to the claims based on the evidence presented at trial.

[16] The Court notes that with respect to the measure of damages for the loss of the helicopter against American Eurocopter, North Carolina law clearly provides that the proper measure of damages would be the fair market value of the helicopter at the time of the crash, without including the gearbox itself (since recovery for the gearbox would be precluded by the economic loss rule), and the Court would see no basis to depart from this general rule in the present case. Cf. State v. Maynard, 79 N.C. App. 451, 452, 339 S.E.2d 666, 667 (1986).

-35-

1. Allegations and Contentions of the Parties with Respect to Plaintiff's Breach of Contract Claims

Plaintiff[17] brings a claim against American Eurocopter for breach of contract, based on Plaintiff's contention that American Eurocopter breached its express warranty to Duke and to CJ because the gearbox and its components were expressly certified as "airworthy" when they were not, in fact, airworthy. In addition, Plaintiff similarly contends that American Eurocopter breached its express certification that the overhaul was performed "in accordance with current regulations of the Federal Aviation Administration and manufacturer's recommendations." Plaintiff also contends that American Eurocopter impliedly warranted that the overhauled gearbox was suitable for its intended use. Plaintiff acknowledges that it was CJ that directly contracted with American Eurocopter for the overhauled gearbox. However, Plaintiff contends that the overhauled gearbox was obtained for Duke's benefit, and that Duke was an intended third party beneficiary of any agreement between CJ and American Eurocopter.[18] Plaintiff further contends that CJ and Duke relied on the express warranties provided by American Eurocopter.

American Eurocopter contends that there are two specific sources of a contractual relationship between American Eurocopter and CJ: (1) the "Spare Parts Agreement" between CJ and American Eurocopter, and (2) the "Purchase Agreement" included on the invoice from

---

[17] As Duke's insurer, Plaintiff stands in Duke's shoes with respect to these claims. The parties do not address Plaintiff's ability, as Duke's insurer, to bring these claims on Duke's behalf, and the Court will therefore assume for purposes of this motion that Plaintiff is a proper party to assert these claims.

[18] Defendants do not directly address whether Duke was, in fact, an intended third party beneficiary of the agreement, although the bill of sale for the gearbox reflects that it is to "Corporate Jets Maintenance, Inc., Duke Life Flight, Duke North Hospital." Because the parties do not directly address this issue, the Court will assume for purposes of this motion that Duke was an intended third-party beneficiary of the agreement.

-36-

American Eurocopter shipped to CJ and Duke with the overhauled gearbox. American Eurocopter contends that these agreements provided for limited warranties that were the exclusive remedy for either CJ or for Duke as third-party beneficiary. The limited warranties provided for repair or replacement of parts, and disclaimed all incidental or consequential damages.

American Eurocopter further contends that Plaintiff, acting on behalf of Duke, cannot bring any claim for breach of the limited warranties because the limited warranty in the parts agreement required return of the parts and a written claim within 30 days of failure, and provided that the warranty only applied to the extent the helicopter was operated in accord with the Flight and Maintenance manuals. Defendant contends that Plaintiff may not recover for any breach of contract because these contractual provisions were not complied with, since CJ and Duke failed to return the defective gearbox (which was destroyed in the helicopter crash), failed to file a written claim, and did not comply with the Flight and Maintenance manuals based on the actions by the pilot and mechanic on the night of the crash. In any event, Defendant contends that all of these issues related to the breach of contract claims are governed by Texas law because the terms of sale for the overhauled gearbox included a Texas choice of law provision.

In response, Plaintiff contends that the limitation of remedies included in the parts agreement and invoice do not apply because CJ contracted with American Eurocopter more broadly for American Eurocopter to provide repair services, and American Eurocopter breached that agreement by failing to provide adequate repair services. Plaintiff further contends that to the extent the limitation of remedies applies, the remedy failed of its essential purpose because Duke and CJ could not obtain repair or replacement of the gearbox after it was destroyed in the helicopter crash.

-37-

Finally, Plaintiff contends that North Carolina law should apply. However, for purposes of the summary judgment motion, Plaintiff contends that even if Texas law applies, the result is the same and the warranty limitations are inapplicable.

> 2. Terms of the Contracts and Warranties Between CJ and American Eurocopter

The dispute between the parties with respect to their contractual relationship and any breach thereof is not subject to an easy determination because there were multiple agreements between various of the parties, and the nature and source of the contract terms that apply to the present claims is unclear. Therefore, in order to determine the applicable contract terms and limitations, the Court must first determine what contracts govern the parties' rights in relation to the gearbox. The first potential contract between the parties is a "Spare Parts Ordering Agreement" between CJ and American Eurocopter, in which American Eurocopter provided a limited warranty for certain helicopter parts that CJ ordered from American Eurocopter. Under Paragraph 7, American Eurocopter warranted all overhauled products by American Eurocopter to be free from defects in material and workmanship under normal use and service. However, "Seller's obligation under this warranty is limited to replacing or repairing parts" if returned to the Seller within 6 months or 500 flying hours. The contract provides that this was the exclusive remedy in lieu of "all incidental or consequential damages."

Another source of contractual obligations relied upon by the parties is based upon the Service Center Agreement between CJ and American Eurocopter, which established CJ as an authorized service center for E.S.A.S. helicopters. The Agreement provided that "[a]ll parts sold to the Service Center by American Eurocopter shall be exclusively subject to American Eurocopter's standard warranty." Pursuant to this Agreement, CJ was required to incorporate that

-38-

standard warranty clause into all of its agreements with its customers (such as Duke) for sale of American Eurocopter's parts and equipment.

The final source of contractual rights cited by the parties is contained in the "Purchase Agreement" contained in the invoice sent by American Eurocopter to CJ at "Duke Life Flight" with the overhauled transmission. This agreement provided that American Eurocopter warranted all parts overhauled by American Eurocopter to be free from defects in material and workmanship under normal use and service for 9 months or 750 flying hours. The invoice provided that American Eurocopter's obligation under the warranty was limited to "repair or replacement" of the defective parts. The invoice required the buyer to return the parts within 30 days of a part failure, and further provided that the warranty would only apply to the extent the helicopter and parts were maintained in accordance with the Flight Manual and Maintenance Manual. The invoice provided that these warranties were the exclusive warranties, excluded any claims for negligence or strict liability, and provided that these were the exclusive remedies "to the exclusion of any and all other remedies including . . . incidental or consequential damages." In addition to these provisions in the invoice itself, American Eurocopter also issued a certification that the overhauled gearbox was "airworthy."

Based on these various agreements and terms, the Court draws the following conclusions: American Eurocopter provided an express warranty that the overhauled gearbox would be free from defects in material and workmanship and that the overhauled gearbox was "airworthy." The evidence also indicates that American Eurocopter expressly warranted that the overhaul was performed "in accordance with current regulations of the Federal Aviation Administration and manufacturer's recommendations." To the extent Texas law would apply as Defendants suggest,

-39-

the Court finds that there is a genuine issue of material fact as to whether any of these express warranties could have been disclaimed by the language in the invoice or any of the other agreements. See Tex. Bus. & Com. Code Ann. § 2.316(a) (providing that a limitation or negation of express warranties is "inoperative to the extent that such construction is unreasonable"); Mercedes-Benz of North America, Inc. v. Dickenson, 720 S.W.2d 844, 852 (Tex. App. Fort Worth 1986) ("The principal purpose of section 2.316 is to protect a buyer from unexpected and unbargained for language of disclaimer by denying effect to such language when inconsistent with express warranties made."); Materials Marketing Corp. v. Spencer, 40 S.W.3d 172 (Tex. App. Texarcana 2001) (holding that disclaimer of warranties in language of invoice did not preclude recovery for breach of express warranties).   Therefore, even if the other implied warranties were disclaimed, there is a jury question as to whether there was a breach of any express warranties that would provide a basis for Plaintiff's contract claims.  Having determined that Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to the breach of contract claims, the Court will turn to Defendant's contentions that Plaintiff's claims are nevertheless precluded under the terms of the agreements.

### 3.        Plaintiff's Failure to Comply with Warranty Requirements

To the extent that American Eurocopter contends that any warranty was voided because the helicopter and parts were not maintained or used as required by the Flight Manuals, the Court concludes that there are genuine issues of material fact as to whether any action by the pilot or mechanic in disconnecting the warning light and flying the helicopter back to Duke would constitute a violation of the contract provisions to void the warranty.  As previously discussed, there are questions for the jury whether the actions of the pilot and mechanic were, in fact, alterations of

the product, and the issue of whether Duke or CJ breached any warranty requirements will be for the jury. In addition, Plaintiff will be entitled to present its own defenses as to these alleged breaches by CJ or Duke. In any event, these determinations are for the jury, and the Court cannot find as a matter of law that CJ or Duke breached the warranty terms so as to void any warranties expressly given by American Eurocopter.

4.    Limitation of Damages and Failure of Essential Purpose

The final question then is whether the limitation of remedies nevertheless limits Plaintiff to "repair or replacement" of the gearbox and precludes recovery of consequential damages, including the destruction of the helicopter itself. Such limitations are generally enforceable under Texas law, particularly between commercial parties. Tex. Bus. & Com. Code Ann. § 2.719 (providing that an agreement may limit the buyer's remedies to repair or replacement of non-conforming goods or parts); Mercedez-Benz, 720 S.W.2d at 854 ("The parties to a contract are free to reasonably limit their remedies under section 2.719."). However, "where an apparently fair and reasonable limitation because of circumstances fails in its purpose or operates to deprive a party of the substantial value of the bargain, the limited remedy must give way to the general remedy provisions of the code." Id.

Texas courts have held that a "repair or replace" warranty fails of its essential purpose when the seller is unwilling or unable to correct defects in the product. See, e.g., Mercedes-Benz, 720 S.W.2d at 854-55 (holding that there was sufficient evidence from which a jury could find that a repair or replace warranty on a car failed of its essential purpose where the car was taken for repairs multiple times over an eight-month period and was never properly corrected); Metro Nat'l Corp. v. Dunham-Bush, Inc., 984 F. Supp. 538, 544 (S.D. Tex. 1997) (holding that a "parts and labor"

-41-

warranty failed of its essential purpose where the defendant initially provided replacement compressors but then ceased providing replacements during the warranty period). In addition, a Federal District Court in Minnesota applying Texas contract law held that there was sufficient evidence from which a jury could find that a "repair and replace" warranty on the purchase of an airplane failed of its essential purpose when the airplane crashed and repair was impossible. Held v. Mitsubishi Aircraft Int'l., 672 F. Supp. 369, 383 (D. Minn. 1987) ("If the alleged defective design caused the crash, then defendants cannot 'repair or replace' its defective parts and must be required to replace the plane or refund its value").

Defendant, however, cites a Second Circuit case applying California law for the contention that the crash of an airplane would not cause the limited remedy to fail of its essential purpose. Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp., 617 F.2d 936 (2d Cir. 1980). However, in that case, the court held that where the manufacturer provided a one-year limited warranty and the airplane crash occurred more than three years after the sale, and there were no allegations of intentional misrepresentation, the one-year warranty did not fail of its essential purpose. Id. at 940-41. However, other courts have held that where a helicopter or airline crash occurs during the warranty period, a "repair or replace" warranty fails of its essential purpose. See Held, 672 F. Supp. at 383; Champlain Enters., Inc. v. United States, 957 F. Supp. 26 (N.D.N.Y. 1997) (holding that a genuine issue of material fact existed as to whether an airplane warranty for repair or replacement of defective parts failed of its essential purpose when a defective part allegedly caused the airplane to crash, since "a reasonable juror could conclude that requiring [the seller] to merely provide a new part when the entire aircraft has been destroyed, 'operates to deprive [Plaintiff] of the substantial value of the bargain.'" (internal citations omitted)); see also Comind, Companhia de Seguros v.

-42-

<u>Sikorsky Aircraft Div. of United Techs. Corp.</u>, 116 F.R.D. 397 (D. Conn. 1987) (holding that where a latent defect allegedly caused the crash of a helicopter, a limited warranty for repair or replacement of defective parts fails of its essential purpose).

Based on these cases and the facts of the instant case as presently before the Court, the Court concludes that there is a genuine issue of material fact as to whether the "repair and replace" warranty failed of its essential purpose, when the allegedly defective part destroyed itself. The Court concludes, therefore, that the evidence presently before the Court would support an inference that "because of circumstances," the repair or replace remedy "fails in its purpose or operates to deprive a party of the substantial value of the bargain." <u>Mercedez-Benz</u>, 720 S.W.2d at 854. Therefore, the Court finds that American Eurocopter has failed to establish that the limitation of remedy provisions preclude Plaintiff's breach of contract claims as a matter of law, and summary judgment on this basis is therefore inappropriate.

V.      CONCLUSION

After having considered all of Defendants' contentions, the Court finds that there are genuine issues of material fact precluding summary judgment for Defendants as to each of Plaintiff's claims. Therefore, Defendants' Motions for Summary Judgment [Documents # 19, 21] are DENIED in their entirety. Defendants' Motion to Exceed the Page Limit for the Summary Judgment Brief [Document #41] is GRANTED, Plaintiff's Motion to Strike Defendants' Summary Judgment Brief for Exceeding the Page Limit [Document #31] is DENIED, and Defendants' duplicate Motion for Summary Judgment [Document #71] is DENIED AS MOOT. Plaintiff's Motion to Strike Defendants' Reply Brief [Document #61] is DENIED, and Plaintiff's Motion for Leave to File a Supplemental Brief [Document #126] is also DENIED. The Court will hear and

determine the parties' remaining motions in limine and motions to strike at the trial in this matter,

consistent with the determinations in this Opinion.

This, the 8th day of July, 2005.

United States District Judge